923 F.2d 1277
 Prod.Liab.Rep.(CCH)P 12,739
David MORRIS, Appellant,
v.
BARKBUSTER, INC. Isanti Engineering, Inc. Diversified
Industries, Inc., F.W. and Associates, Inc. Fred
W. Wagenhals, Individually, Ed Fochtman,
Jr., Individually, Appellees.
 No. 89-5261.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1990.
Decided Jan. 9, 1991.
 
 Charles E. Moore, Owensboro, Ky., for appellant.
 Robert W. Kettering, Jr., Minneapolis, Minn., for appellees.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This is a product liability suit. Federal subject matter jurisdiction is based on diversity of citizenship. Plaintiff David Morris appeals from the order of the District Court[1] granting the motion of defendants F.W. and Associates, Inc. (FWA), Fred W. Wagenhals, and Ed Fochtman, Jr. for dismissal for lack of personal jurisdiction. We affirm.I.
 
 
 2
 FWA is an Ohio corporation with its principal place of business in Arizona.[2] From 1976 to 1978 FWA developed and marketed a log splitter powered by tractor power takeoff. This log splitter was sold under the trade name Barkbuster through a number of distributors including Diversified Distributing, Inc. (DDI), a Minnesota corporation, which handled the largest volume.[3] On December 5, 1978, FWA sold the Barkbuster log splitter product line to DDI. This sale was negotiated and executed in Arizona.
 
 
 3
 At that same time Wagenhals and Fochtman, both residents of Arizona and co-owners of FWA, entered into a separate consultation agreement with DDI. This agreement obligated Wagenhals and Fochtman to assist DDI in the engineering, production, and marketing of log splitters, and required DDI to pay royalties to Wagenhals and Fochtman upon the sale of the devices. This, too, was negotiated and executed in Arizona.
 
 
 4
 Pursuant to the contract for the sale of the Barkbuster product line, FWA shipped twenty-one truckloads of material, including some completed units, to DDI at its place of business in Minnesota. Shortly thereafter, FWA sent five employees to Minnesota to assist DDI in conducting a physical inventory of this material. In addition, either Wagenhals or Fochtman attended a dinner and cocktail party in Minnesota to help facilitate the transfer to DDI of the goodwill associated with the Barkbuster line.[4] Finally, following a default by DDI in its payments to FWA, both Wagenhals and Fochtman made a trip to Minnesota to investigate DDI's failure to make its payments. DDI never called upon Wagenhals or Fochtman to provide consultation services, nor did either of them ever provide such services to DDI. DDI failed to make all its contractually required payments to Wagenhals and Fochtman.
 
 
 5
 On January 7, 1984, David Morris, a citizen of Kentucky, lost both of his arms in an accident in Kentucky involving a Barkbuster log splitter manufactured and distributed by DDI. He subsequently filed suit for damages in the federal district court for the Western District of Kentucky naming FWA as one of the defendants.[5] That court found personal jurisdiction over FWA lacking and therefore granted FWA's motion dismissing it from the action. Morris then filed the present action in the District Court of Minnesota and moved the District Court in Kentucky to hold the action in that court in abeyance pending the outcome of his Minnesota action. Kentucky v. Morris, No. 88-H-003 (December 20, 1988). In his Minnesota action Morris charges FWA with having designed the log splitter negligently and having failed to warn DDI, as well as the previous and potential users of the log splitter, of the dangerous condition of the device. Plaintiff's Complaint at 7-8, Morris v. Barkbuster, Inc., No. 4-87-108 (D.Minn. Filed Feb. 23, 1987). He also charges Wagenhals and Fochtman with "manufacturing, designing, selling and promoting" defective log splitters, failing to "redesign, render safe, or recall" the devices, and failing to warn DDI as well as present and potential users of the log splitter, of its dangerous condition. Id. at 8-9. In an unreported opinion the District Court concluded that the Minnesota contacts of these defendants did not give rise to any of the plaintiff's claims, that the defendants did not have continuous and systematic contact with Minnesota, and therefore that, under the Due Process Clause, the court lacked personal jurisdiction over FWA, Wagenhals, and Fochtman and therefore dismissed Morris's claims against these defendants. Morris v. Barkbuster, No. 4-87-108 (D.Minn. July 20, 1988) (order granting motion to dismiss). Morris appeals from that order.[6]
 
 II.
 
 6
 A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause. Falkirk Mining Co. v. Japan Steel Works, 906 F.2d 369, 372-73 (8th Cir.1990). Here the District Court went directly to the constitutional question without first giving any apparent consideration to the question whether the Minnesota long-arm statute would provide a threshold basis for jurisdiction over the FWA defendants. Because we agree with the District Court that it would be inconsistent with due process to require the FWA defendants to litigate this case in Minnesota, we need not and do not pause to analyze the Minnesota long-arm statute. Instead, like the District Court, we go directly to the constitutional analysis.
 
 III.
 
 7
 Under the Due Process Clause of the Fourteenth Amendment, jurisdiction over the person of an out-of-state defendant is proper only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). Minimum contacts exist where the defendant has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40, 2 L.Ed.2d 1283 (1958). The minimum contacts test is satisfied where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).
 
 
 8
 When the plaintiff's claims "arise out of or are connected with the [defendant's] activities within the [forum] state," International Shoe, 326 U.S. at 319, 66 S.Ct. at 160, maintenance of the action within the forum state generally does not offend "traditional notions of fair play and substantial justice," id. at 316, 66 S.Ct. at 158 (quoting Milliken v. Meyer, 311 U.S. at 463, 61 S.Ct. at 343), as in these circumstances the defendant ordinarily "should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567. Conversely, when the plaintiff's claims do not relate to the defendant's forum-state activities, jurisdiction is likely to be improper since the defendant has "no reason to expect to be haled before [the forum state's] court[s]." Toro Co. v. Ballas Liquidating Co., 572 F.2d 1267, 1271 (8th Cir.1978) (quoting Shaffer v. Heitner, 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977)). Where a court premises jurisdiction over a defendant upon the relationship between the plaintiff's claims and the defendant's forum state activities, it has been said that the court is exercising "specific jurisdiction." Helicopteros Nacionales De Colombia v. Hall, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984).
 
 
 9
 Jurisdiction may be proper despite the fact that the plaintiff's claims neither arise out of nor are related to the defendant's contacts with the forum. See Perkins v. Benguet Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). However, a defendant may only be subject to this type of "general jurisdiction," Helicopteros, 466 U.S. at 414 n. 9, 104 S.Ct. at 1872 n. 9, where the defendant's contacts with the forum are "continuous and systematic." Helicopteros, 466 U.S. at 416, 418-19, 104 S.Ct. at 1872-73, 1874-75 (finding no jurisdiction because corporate defendant's forum contacts were not "of a continuous and systematic" nature); Perkins, 342 U.S. at 448, 72 S.Ct. at 419-20 (corporation carried on "continuous and systematic" activities within forum). We conclude, as did the District Court, that none of the FWA defendants has established this type of continuous and systematic contact with the state of Minnesota. They therefore are not subject to general jurisdiction in Minnesota. Accordingly, our inquiry is limited to the question of whether any of Morris's dismissed claims arise out of or are related to the Minnesota contacts of the defendants, i.e., whether the defendants are properly subject in this case to specific jurisdiction.[7]
 
 IV.
 
 10
 We turn first to FWA. Morris has charged FWA with negligently designing the log splitter and failing to warn of its dangerous propensity and maintains that jurisdiction over these claims is proper in Minnesota. We disagree.
 
 
 11
 FWA is an Ohio corporation with its principal place of business in Arizona. It is not licensed to do business in Minnesota, and it has no agents, offices, employees, or property there, nor does it solicit or advertise any business there. In addition, though it did originally create the design of the Barkbuster log splitter,[8] nothing in the record suggests that the design process was in any way connected with Minnesota.
 
 
 12
 Morris argues that FWA's contract with DDI for the sale of the Barkbuster product line, together with the three trips FWA's employees made to Minnesota, constitute contacts from which Morris's claims against FWA arise. While we agree that the sales contract and the incidental trips constitute "contacts" with the state of Minnesota, we do not agree that Morris's claims arise from these contacts. In addressing the role of contracts in personal jurisdiction analysis, the Supreme Court has stated that a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943). Thus a determination of whether the sales contract constituted a sufficient Minnesota contact requires that we consider the "real object of the business transaction." Id. It is the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Burger King v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985). Here all negotiations for the contract occurred outside of Minnesota. It was not executed in Minnesota. In fact, when FWA sold the log splitter line to DDI it appeared to be eliminating its ties to Minnesota, not expanding them, as DDI previously had been FWA's distributor in Minnesota. Although FWA shipped parts to Minnesota pursuant the sales contract and three times sent its employees there,[9] these actions related to the implementation of the sales contract and the transition of ownership, not to the design of the log splitters. We would agree that these contacts might support Minnesota jurisdiction over FWA in a dispute arising out of the contract with DDI. See Burger King, 471 U.S. 462, 105 S.Ct. 2174. We believe, however, that they are clearly insufficient to support Minnesota jurisdiction over FWA in Morris's lawsuit for injuries he suffered in Kentucky while using a log splitter manufactured and sold by DDI after its acquisition of the Barkbuster line from FWA.
 
 
 13
 Morris also contends that jurisdiction may be premised upon FWA's extensive pre-December 5, 1978 commercial relationship with DDI, which prior to that date was FWA's distributor of the Barkbuster product line in Minnesota. However, he fails to show any connection between his claims against FWA and these Minnesota contacts of FWA and we are able to find none. All of these contacts occurred long before Morris's injury, had nothing to do with the design of the log splitter, preceded FWA's virtual dissociation with Minnesota, and are in no way related to Morris's later injury in Kentucky by a machine as to which FWA controlled neither the manufacture or distribution. Consequently, these contacts are of no assistance to Morris in establishing Minnesota jurisdiction.
 
 
 14
 Morris also argues that FWA's right to receive future payments under the sales contract somehow links FWA to Morris's claims against it. While it is clear that FWA had the right to future payments from DDI, this hardly can be characterized as a contact with the state of Minnesota, see Institutional Food Marketing Associates, Ltd. v. Golden State Strawberries, Inc., 747 F.2d 448, 456 (8th Cir.1984) ("it is a defendant's contacts with the forum state that are of interest in determining whether personal jurisdiction exists, not its contacts with a resident of the forum"), and in any event Morris's injury neither arises from nor is related to FWA's contractual right to payments from DDI. Thus, FWA's right to receive future payments from DDI does not give Morris a basis for pursuing his claim against FWA in Minnesota.
 
 
 15
 Finally, Morris relies upon Burger King to support a finding of jurisdiction in Minnesota. However, Burger King is inapposite. There the Supreme Court upheld Florida's exercise of personal jurisdiction over a Michigan defendant, Rudzewicz, a franchisee of Burger King which is a Florida corporation. The franchise agreement was entered into in Florida and provided that all fee payments and relevant notices were to be sent to Florida. Furthermore, prior to entering the agreement, Rudzewicz with some success had negotiated with Burger King's Miami office over a variety of issues. Later, after Rudzewicz defaulted on his payments to Burger King, Burger King terminated the franchise and ordered Rudzewicz to cease doing business. Rudzewicz refused, continued doing business, and was then sued in Florida. Id. 471 U.S. at 466-69, 105 S.Ct. at 2178-80. Burger King's suit against Rudzewicz thus centered upon his breach of the franchise agreement. In contrast, Morris's claim is that FWA negligently designed the log splitter and failed to warn about it, not that FWA in some way harmed Morris by contracting with DDI to sell it the Barkbuster line. In addition, the FWA-DDI contract was negotiated and entered into in Arizona, not the forum state of Minnesota. The critical distinction between Burger King and this case is that in Burger King the plaintiff's claims against the defendant were related to the defendant's forum contacts, whereas here they are not.
 
 
 16
 After considering the allegations of Morris's complaint, we conclude that any relation between FWA's limited contacts with Minnesota and Morris's personal injury claim is, at best, highly attenuated, and insufficient to support Minnesota's exercise of jurisdiction over FWA in this action. We therefore hold that the dismissal of Morris's action against FWA was required by the Due Process Clause of the Fourteenth Amendment.
 
 V.
 
 17
 We come next to the question of in personam jurisdiction over Wagenhals and Fochtman. Morris has charged them, along with FWA, with "manufacturing, designing, selling and promoting" defective log splitters, failing to correct the problem, and failing to warn DDI and users of the devices of the potential danger. Plaintiff's Complaint at 8-9, Morris v. Barkbuster, No. 4-87-108 (D.Minn. Filed Feb. 23, 1987). Here again we agree with the District Court's dismissal of Morris's claims.
 
 
 18
 Wagenhals and Fochtman are the co-owners of FWA. Although they were involved in FWA's design and manufacture of the Barkbuster log splitters, there is nothing in the record to suggest that these activities occurred in Minnesota. In addition, Wagenhals and Fochtman participated in FWA's promotion and sale of the Barkbuster product line to DDI. They undertook these activities as agents for FWA, and we already have concluded that no relationship exists between FWA's activities in Minnesota prior to DDI's acquisition of this product line and Morris's later injury in Kentucky.
 
 
 19
 The crux of Morris's argument for jurisdiction over Wagenhals and Fochtman centers upon their consultation agreement with DDI. To determine whether this agreement constitutes a contact with Minnesota sufficient to support jurisdiction over Wagenhals and Fochtman in Morris's action in Minnesota we must look to the "real object of the business transaction," Hoopeston Canning Co., 318 U.S. at 317, 63 S.Ct. at 605, which requires us to consider the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing...." Burger King, 471 U.S. at 479, 105 S.Ct. at 2185.
 
 
 20
 The consultation agreement provided that Wagenhals and Fochtman would assist DDI in the engineering, production, and sales of log splitters, and the agreement was to be construed under Minnesota law. Appendix to Appellant's Brief at 96-97, Morris v. F.W. and Assoc., No. 89-5261MN (Filed July 11, 1989) (Consulting Agreement). Like the sales agreement, the consultation agreement was negotiated and executed in Arizona. Significantly, it never was fully implemented. Neither Wagenhals or Fochtman ever was called upon to assist DDI in the engineering, production, or sales of log splitters, nor did DDI make all the payments required by the agreement. Indeed, we find nothing in the record disputing Wagenhals's and Fochtman's deposition testimony that the consultation agreement was nothing more than a means for the two of them to avoid the double taxation that would result if DDI's payments were made first from DDI to FWA, and then from FWA to Wagenhals and Fochtman. See Appendix to Appellant's Brief at 40, 56-57, Morris v. F.W. and Assoc., No. 89-5261MN (Filed July 11, 1989) (Depositions of Ed Fochtman and Fred Wagenhals, respectively). Morris argues that Wayne Moreland, president of DDI, believed consultation services actually were to be provided under the consultation agreement, but the record does not support this argument. Morris quotes Moreland's deposition in which Moreland testified that, "The stated purpose of the agreement was to provide them [Wagenhals and Fochtman] remuneration for their advice and expertise to help us [DDI] with the ongoing business." Brief for Appellant at 10, Morris v. F.W. and Assoc., No. 89-5261MN (Filed July 11, 1989) (Deposition of Wayne Moreland). However, this says nothing more than what the "stated purpose" of the contract was, and reveals nothing of the real object or purpose of the agreement.[10] Given that both Wagenhals and Fochtman testified directly that the agreement was merely a mechanism to avoid double taxation, that their testimony has not been contradicted by any testimony from anyone at DDI, that DDI never requested Wagenhals or Fochtman to perform any consultation services, and that Wagenhals and Fochtman never performed any such services for DDI, we cannot conclude the "real object of the business transaction" was such that this agreement could be considered a contact with the state of Minnesota sufficient to support jurisdiction over Wagenhals and Fochtman in Morris's action.
 
 
 21
 Morris argues that the facts in Burger King are so similar to the facts here that the holding in Burger King requires us to conclude that in personam jurisdiction is constitutionally proper as to Wagenhals and Fochtman. Morris reasons that the only distinction between Burger King and the case at bar is that Burger King was a party to the contract there, whereas Morris is not a party to the contract here. We disagree. In the first place, we believe that this distinction is not without significance. Moreover, that is not the only important distinction between this case and Burger King. As we pointed out earlier, Burger King's suit was against its franchisee for claims related directly to his breach of the franchise agreement, which had been negotiated and executed in, and was administered from, the forum state. It is this connection between the defendant's forum contacts and the plaintiff's cause of action that is missing here. Morris does not argue that his personal injury claims are related to consultation services provided by Wagenhals and Fochtman in Minnesota, and such an argument would fail because neither ever rendered such services to DDI. Rather, Morris invites us to premise jurisdiction upon the mere existence of the consultation agreement, ignoring the reality that that agreement, an attenuated contact with Minnesota at most, had nothing to do with the injury he suffered. We decline to accept this invitation. In our view, neither the consultation agreement nor Burger King assists Morris in his efforts to establish Minnesota jurisdiction.
 
 
 22
 Morris also relies upon the three trips Wagenhals and Fochtman made to Minnesota following the sale of the Barkbuster line to DDI. Our discussion of these trips in part IV of this opinion obviates any need for further discussion of them. As we already have established, none of these trips was prompted by or concerned with the manufacture, design, sale, or promotion of the log splitters.[11] They therefore have no discernable relationship to Morris's personal injury claims against these defendants.
 
 
 23
 Although Wagenhals and Fochtman did have limited contacts with Minnesota, any relationship between those contacts and Morris's claims against Wagenhals and Fochtman is highly attenuated if it exists at all, and is an insufficient basis under the Fourteenth Amendment's Due Process Clause for Morris's assertion of jurisdiction in Minnesota over these defendants.
 
 VI.
 
 24
 The order of the District Court dismissing Morris's action against FWA, Wagenhals, and Fochtman for lack of personal jurisdiction is affirmed.
 
 
 25
 BRIGHT, Senior Circuit Judge, dissenting.
 
 
 26
 I dissent.
 
 
 27
 I disagree with the majority's narrow application of the terms "arising out of" and "related to."[1] Apparently relying on the fact that Morris's cause of action against the present defendants arises from the allegedly defective design of the log splitter, the majority limits its analysis to whether the alleged contacts relate directly to the design process. Thus, the majority discounts many of the contacts stemming from the sales contract as not related to the design of the log splitter.[2]
 
 
 28
 However, a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943). It is the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).
 
 
 29
 Here, the "real object of the business transaction" was the sale of the design itself. Furthermore, the contract contemplated continuing royalties to FWA based, in part, upon the success of that design. Additionally, Wagenhals and Fochtman entered into a consulting agreement with DDI which required them to provide and assist DDI in the engineering, production and sale of the log splitters in Minnesota. Thus, contrary to the majority, I believe the contacts stemming from the negotiation and execution of the contracts relate to Mr. Morris's cause of action for the defectively designed log splitter and support his claim that personal jurisdiction exists.
 
 
 30
 Accordingly, I would reverse the district court's dismissal for lack of personal jurisdiction.
 
 
 
 [1]
 The Honorable Harry MacLaughlin, United States District Judge for the District of Minnesota
 
 
 [2]
 Prior to January 1978 FWA had its principal place of business in Ohio
 
 
 [3]
 Diversified Distributing, Inc. later changed its name to Diversified Industries, Inc
 
 
 [4]
 The record is unclear as to which one actually made the trip
 
 
 [5]
 The other defendants were Barkbuster, Inc., Isanti Engineering, Inc., and DDI. See Appellant's Brief at 4, Morris v. F.W. and Associates, No. 89-5261MN (Filed July 11, 1989)
 
 
 [6]
 Morris also included Barkbuster, Inc. (Barkbuster), Isanti Engineering, Inc. (Isanti), and Diversified Industries, Inc. as defendants in his Minnesota action in addition to FWA, Wagenhals and Fochtman. However, shortly after the dismissals of these last three defendants, Morris reached a settlement with Barkbuster, Isanti, and DDI, stipulating to their dismissal with prejudice. Morris v. Barkbuster, No. 4-87-108 (Filed May 4, 1989) (Stipulation of Dismissal). With those three defendants removed from the action, the order dismissing FWA, Wagenhals, and Fochtman concludes the "entire controversy," Cobbledick v. United States, 309 U.S. 323, 326, 60 S.Ct. 540, 541-42, 84 L.Ed. 783 (1940), and thus there is no question that this order is appealable
 
 
 [7]
 Morris concedes that general jurisdiction is lacking, at least with respect to Wagenhals and Fochtman. Brief for Appellant at 9, Morris v. F.W. and Assoc., No. 89-5261MN ("Morris relies on specific jurisdiction, not general jurisdiction to bring Wagenhals and Fochtman before the Court")
 
 
 [8]
 There is a dispute over whether DDI continued to manufacture log splitters according to FWA's original design. However, for the purpose of reviewing the dismissal of Morris's claim, we assume any design changes made by DDI were unrelated to Morris's subsequent injuries. Wines v. Lake Havasu Boat Mfg., 846 F.2d 40, 42 (8th Cir.1988) ("In reviewing the district court's determination [dismissing the plaintiffs claims for lack of personal jurisdiction] based upon written submissions, this court must view the facts in the light most favorable to [the plaintiffs]")
 
 
 [9]
 The first trip involved an inventory of some of the assets transferred from FWA to DDI. Appendix to Appellant's Brief at 33, Morris v. F.W. and Assoc., No. 89-5261MN (Filed July 11, 1989) (Deposition of Jack Atha). Wagenhals and Fochtman were among the employees who went to Minnesota. Id. at 34. Although the record is not very clear regarding who took the second trip, it is clear that Wagenhals, Fochtman, or both went, and their purpose in Minnesota was to be present at DDI's distributor's meeting so as to facilitate the transfer of FWA's goodwill with respect to the Barkbuster line. Id. at 22 (Deposition of Wayne Moreland). Both Wagenhals and Fochtman made the third trip which was prompted by DDI's default in its payments
 
 
 [10]
 Morris also cites a rather lengthy portion of Wagenhals's deposition testimony that Morris claims belies the notion that the consulting agreement was a sham. See Appellant's Reply Brief at 1-2, Morris v. F.W. and Assoc., Inc., No. 89-5261MN (Filed Aug. 24, 1990) (quoting Appendix to Appellee's Brief at A-79-80). However, Morris misreads this deposition testimony. In the quoted language, Wagenhals admits that he was obliged to help DDI get started, not that he or Fochtman had obligations under the consultation agreement. Furthermore, the testimony upon which Morris relies is out of context. For example, the question immediately preceding the language cited by Morris, is "[w]ere you to provide any services under the consulting agreement, that is, you or Mr. Fochtman?" Appendix to Appellee's Brief at A-79, Morris v. Barkbuster, Inc., No. 89-5261MN (Filed Aug. 9, 1990), to which Wagenhals's responds "No." Id. Finally, near the end of that same line of questioning, Wagenhals states that "the first thing you have got to understand is that the consulting agreement was only drawn up to avoid double taxation on Mr. Fochtman and myself." Id. at A-81. Thus, Wagenhals's testimony does not assist Morris
 
 
 [11]
 See supra note 9
 
 
 [1]
 See, e.g., Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1983); International Shoe v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159-60, 90 L.Ed. 95 (1945)
 
 
 [2]
 See ante pp. 1281-82: "Although FWA shipped parts to Minnesota pursuant [to] the sales contract and three times sent its employees there, these actions related to the implementation of the sales contract and the transition of ownership, not to the design of the log splitters;" and, ante p. 1282, "in any event Morris's injury neither arises from nor is related to FWA's contractual right to payments from DDI."